J-S83045-16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| IN RE: K.N.B., A/K/A K.N.B, A/K/A K.B., A MINOR, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.H., BIRTH MOTHER | : | No. 1092 WDA 2016 |

Appeal from the Order Entered June 8, 2016
in the Court of Common Pleas of Allegheny County
Orphans' Court, at No(s): CP-02-AP-0000185-2015

BEFORE:    FORD ELLIOTT, P.J.E., SHOGAN, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:        **FILED DECEMBER 29, 2016**

L.H. (Mother) appeals from the June 8, 2016 order that granted the petition of Allegheny County Children, Youth, and Families (CYF) to terminate involuntarily Mother's parental rights to her minor son, K.N.B. (Child).  We affirm.

The orphans' court offered the following summary of the history of this case.

> Child was born in March, 2014 to [Mother], who identified I.B. as [] Child's Father.  Child came to the attention of CYF in April, 2014, when Child was a few weeks old, after CYF received a Child Line report that Child had arrived at Children's Hospital with a femur fracture.  CYF conducted an investigation, and finding no definitive evidence as to the cause of the injury, in May, 2014, CYF closed its investigation.  In June, 2014, CYF received a report that Child was found unresponsive in parental care, and had been taken to Children's Hospital of Pittsburgh suffering a cardiac arrest, the cause of which could not subsequently be determined.  As a result of Child's hospitalization, CYF conducted an investigation of Child's family, and learned that Mother and Father had been involved in the filing of numerous protection from abuse petitions.  Moreover,

_____

*Retired Senior Judge assigned to the Superior Court.

because the cardiac arrest resulted in Child['s] suffering significant brain impairment and physical impairment, CYF became concerned that Mother and Father might be unable to appropriately care for Child at Mother's residence upon Child's release from hospital.

Following treatment at Children's Hospital of Pittsburgh, Child was transferred to Children's Home for continuing treatment. While Child was receiving treatment at Children's Hospital and the Children's Home, on June 24, 2014 CYF filed a dependency petition which was dismissed in July, 2014. On August 5, 2014, CYF refiled its dependency petition, and following a hearing on September 17, 2014, th[e orphans' c]ourt adjudicated Child dependent after Mother stipulated that she could not care for Child due to his medical needs, and Father was found to be unwilling or unable to care for [] Child. Moreover, neither parent had completed the medical training necessary to meet Child's medical needs.

On September 17, 2014, Child was released from hospital care, and discharged to a foster home that provided specialized care supervised by Passavant Memorial Hospital. On December 4, 2015, the agency filed a Petition for Involuntary Termination of Parental Rights, and following a hearing on May 20, 2016, this Court granted the agency's petition. This appeal followed.[1]

Trial Court Opinion, 7/26/2016, at 1-2 (citations omitted).

Mother presents one question for this Court's consideration:

Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that [CYF] met its burden of proving that termination of [] Mother's parental rights would meet the needs and welfare of [] Child pursuant to 23 Pa.C.S. § 2511(b) by clear and convincing evidence when such determination is not supported by the record?

Mother's Brief at 5.

We begin with our standard of review.

---

[1] Both Mother and the orphans' court complied with Pa.R.A.P. 1925.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis. Here, Mother concedes that CYF met its initial burden under subsection 2511(a) of proving that the parent's conduct warranted termination.[2] Accordingly, we turn to

> the second part of the analysis pursuant to [subs]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

---

[2] Indeed, the trial court held, and we agree, that CYF proved that termination was warranted under subsections 2511(a)(2) (repeated and continued incapacity to provide parental care based upon causes that will not be remedied by the parent), (a)(5) (child in the agency's care for six months and the causes will not be remedied by the parent within a reasonable period of time), and (a)(8) (child removed from the parent's care for 12 months or more and the conditions which led to removal still exist).

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Subsection 2511(b) provides, in relevant part: "The court in terminating the

rights of a parent shall give primary consideration to the developmental,

physical and emotional needs and welfare of the child." 23 Pa.C.S.

§ 2511(b). We have explained the analysis under this subsection as follows.

> Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child. … [T]he trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (internal

citations and quotation marks omitted).

The orphans' court offered a detailed explanation of its findings under

subsection 2511(b).

> In making its determination, th[e orphans' c]ourt relied on the credible testimony of Dr. Barbara Negrini, a pediatrician with Heritage Valley Health System, and who has been Child's primary care physician since Child was six months old. Dr. Negrini testified that Child suffers complicated medical conditions, including respiratory problems for which he has a tracheostomy tube, neurological problems including seizures, "shunts placed in his brain," and orthopedic problems. As a result of his medical problems, Dr. Negrini made clear that Child "needs considerable care for all of his different issues" from various medical specialists as well as occupational therapists, vision therapists and physical therapists, for all of his developmental and physical delays. In addition, Child receives numerous medications, requires oxygen, and is provided all of

his food through a tube. Accordingly, Dr. Negrini testified that Child "basically requires 24-7 care. He cannot be left alone [and] needs somebody that is skilled to manage his needs continually … maintaining his airway, giving his medication and just checking to see if he is changing." Moreover, Dr. Negrini testified that "[Child's] care requires significant training and demonstration of competence in multiple skills before anyone could be left alone with him.["]

Erin Burzynksi, a CYF caseworker, testified that CYF developed Family Service Plans for Mother which included goals that Mother complete the training necessary to care for Child, attend Child's appointments, complete domestic violence classes, secure and maintain appropriate housing, and find a second caregiver to assist her in providing Child with 24-hour care. Ms. Burzynksi testified credibly however, that Mother had difficulty securing appropriate housing to accommodate Child and all of his medical equipment, and that Mother was only able to find [] appropriate housing in January, 2016. Ms. Burzynksi further testified that Children's Home provided services to train Mother as to how to care for Child during her visits with Child, but that although Mother visited Child consistently once a week for two to three hours from September, 2014 until March, 2016, Mother did not complete the remaining training required for care of Child. Moreover, Mother did not obtain a second caregiver adequately trained to provide secondary care to Child.

Ms. Burzynksi further stated that she had observed Child interact with his foster parents who "treat [Child] as a member of their family, they acknowledge his medical condition and needs for his care" and "are comfortable with him and his medical needs." Ms. Burzynski testified that the foster parents are able to provide the care that Child needs when nurses are not available, for example by maintaining "rotating sleep shifts so that [Child] is always one hundred percent cared for by a trained individual."

Th[e orphans' c]ourt further considered the credible testimony of Kelly Kocher, a pediatric nurse supervisor at Interim which provided in-home medical care to Child beginning in July, 2015. Ms. Kocher testified that nursing services are provided to Child for seventeen hours each day, and that the foster parents provide care between the nurse's shifts. During

the periods that Mother visited Child, nursing staff would provide training to Mother, and assess her skills. Ms. Kocher testified that Mother completed training on suctioning Child's tracheotomy tube, and was able to bathe Child and take his temperature, but she did not complete the remaining training necessary for Child's care, including independently changing Child's tracheotomy tube, and maintaining Child's feeding tube. Ms. Kocher explained that Child requires constant monitoring because of his medical needs and that it would be dangerous to leave Child unmonitored even for a few moments, given the danger, for example that Child may pull out his tracheotomy tube, without which he would not be able to breathe on his own. She testified that Mother did not know how to appropriately respond to such an emergency without assistance.

Based on the foregoing evidence and testimony, th[e orphans' c]ourt concluded that CYF proved by clear and convincing evidence that termination of Mother's parental rights best served the needs and welfare of Child pursuant to §2511(b), in light of Child's significant medical needs, and the fact that Mother has not obtained the training necessary for his appropriate care, and has not secured an appropriately trained second caregiver to assist her in providing constant supervision and monitoring of Child.

Trial Court Opinion, 7/26/2016, at 5-7 (citations omitted).

Mother offers the following argument that the orphans' court's decision should be reversed.

Mother submits that based upon the evidence presented at trial, the trial court was not presented with sufficient or compelling evidence upon which to conclude that the termination of Mother's parental rights would serve the needs and welfare of [] Child. Until six weeks prior to trial, Mother maintained consistent visitation with [Child]. The caseworker testified that "it is clear that [Mother] loves [Child]." The record does not establish that [Child]'s placement is dependent upon hi[s] being adopted by the foster parents. Furthermore, the record does not support the finding that Mother maintaining her parental rights would be detrimental to [C]hild or would require the return of [Child] to Mother's custody. The retention of Mother's parental

rights would ensure [Child] could have continued familial contact with Mother who is noted to clearly love her child despite her inability to provide for [his] complex medical care.

Mother's Brief at 15-16 (citations omitted).

Mother's argument focuses upon her bond with Child, not upon any bond Child has with her. In conducting its analysis, the orphans' court was required to consider whether severing the parent-child bond will negatively impact the child, not whether the parent's emotions will suffer by allowing the child to move on to a stable life with adults capable of meeting his needs. *See*, *e.g.*, *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (noting that the analysis under subsection 2511(b) is upon the effect on the child of severing his or her bond with the parent).

Here, Child's medical condition is such that it is difficult to discern the extent to which he is able to form emotional bonds. *See*, *e.g.*, N.T., 5/20/2016, at 15 (explaining that Child is unable to communicate and his needs must be determined based upon interpretation of involuntary cues); *id.* at 93 (indicating that, while Child has brainstem activity, he has no activity "in his actual brain" and that condition is not expected to change). The evidence does support the finding that Child is comfortable with Foster Parents, who have cared for him since he was six months old. *Id.* at 19, 26, 69. Foster Parents treat Child as a member of the family and are willing to adopt him. *Id.* at 73.

Mother, on the other hand, is unable to meet Child's developmental and physical needs. *See*, *e.g.*, *id.* at 61-66 (explaining, *inter alia*, that Mother has not completed the training necessary to care for Child, has not shown that she obtained suitable housing). Although Mother had attended her supervised visits with Child consistently for the first year, she missed four of the last six visits prior to the hearing. *Id.* at 86. While Mother takes the position that there is no harm to Child in maintaining the *status quo*, she declined to testify at the hearing to offer the orphans' court any evidence that Child received any benefit from her continued involvement in his life; rather, she left before the conclusion of the hearing.[3] Indeed, the record contains evidence that her lack of availability actually has hampered the efforts of Foster Parents to see that Child receives medical care. *See id.* at 71 (indicating that Mother had increasingly failed to show for Child's doctor appointments; in one instance Foster Parents "were able to finally reach her via phone for permission").

Thus, to the extent that Child has bonded with any parental figures, it is with Foster Parents. There is no evidence in the record that Child has any bond whatsoever with Mother; thus, we assume that no such bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) ("In cases where

_____

[3] Mother's counsel explained: "My client, [Mother] during the recess chose to no longer participate in the proceedings. Her basic statement to me was that she as a mother has tried her best and that she's just no longer going to participate and that she knows [Child] is getting good care." N.T., 5/20/2016, at 107.

there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists.").

Accordingly, we discern no error of law or abuse of discretion in the orphans' court's determination that terminating Mother's parental rights will best serve the needs and welfare of Child.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/29/2016